CV 15        2687

ORIGINAL

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| JASON SIMMONS | § | BRODIE, J. |
| Plaintiff, | § | |
| | § | |
| vs. | § | JURY TRIAL DEMANDED |
| | § | |
| | § | |
| Attorney, Ray Jackson, | § | |
| Defendant. | § | |

2015 MAY -7 PM 3:14 FILED CLERK U.S. DISTRICT COURT EASTERN DISTRICT OF NEW YORK

## ORIGINAL COMPLAINT AND JURY DEMAND BY PLAINTIFF JASON SIMMONS

### TO THE HONORABLE JUDGE OF SAID COURT:

**NOW COMES,** Jason Simmons, hereinafter called "Plaintiff," complaining of and about Attorney, Ray Jackson, hereinafter called "defendant," and for the cause of action shows unto the Court the following:

### I. PARTIES AND SERVICE

Plaintiff, Jason Simmons, is a citizen of the United States of America and of the State of New York. He resides in Queens County, New York and, he may be served at 417 Myrtle Ave, BOX #2, Brooklyn, NY 11205.

Defendant, Attorney Ray Jackson, may be served at his place of business 3838 Oak Lawn, Suite 1350 Dallas, Texas 75219.

### II. JURISDICTION

The Complaint arises under 28 U.S. Code § 1332 (a), as the plaintiff does not share a state of citizenship with the defendant and, the amount in controversy exceeds $75,000.

### III. VENUE

The Eastern District of New York is the proper venue for this lawsuit because the plaintiff resided in Queens County, New York at the time of the conduct taken by the defendant. Plaintiff still resides in Queens County, New York.

### IV. NATURE OF ACTION/APPLICABLE LAW

The events complained of arise out of the defendant's conduct acting as the plaintiff's lawyer before the UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

1

22  TEXAS DALLAS DIVISION in CIVIL ACTION NO. 3:14-CV-2958-B initiated on January 4,
23  2011, therefore, the Texas common law will apply to the defendant's conduct. The statute of
24  limitations for breach of fiduciary duty in Texas is four years (Tex. Civ. Prac. & Rem. Code
25  Ann. § 16.004(a) (5) (Vernon 2002). The events complained of occurred in 2012, before the
26  disposition of Federal Docket Number 3:11-CV-0017-B on April 26, 2012.
27
28                                            **V. FACTS**

29         Attorney, Ray Jackson, ("defendant/counsel"), was hired by the plaintiff in May of 2010,

30  to file a lawsuit against Dallas Methodist Hospital, ("hospital"), following plaintiff's

31  employment suspension/termination.

32         Plaintiff provided his counsel with a litany of evidence to prove what he believed was

33  misconduct by the hospital including but not limited to: an audio recording of the final hearing

34  held between himself and the hospital, ("Exhibit A"), and, a copy of the 2009 complaint of

35  harassment plaintiff made to Dr. Manuel Rivera, MD, the hospital's designated institutional

36  official, ("DIO"), for the Accreditation Counsel for Graduate Medical Education ("ACGME"),

37  ("Exhibit B").

38         Plaintiff also asked the defendant several legal questions during conversations that took

39  place in counsel's office, over the phone and, via email. For example, on November 11, 2010,

40  the plaintiff asked the defendant about potential breach of contract claims, ("Exhibit C").

41         Defendant told the plaintiff that he would answer the plaintiff's questions at a future

42  meeting and, to be patient because the legal process takes a long time.

43         The defendant filed a singular complaint of Racial Discrimination against the hospital, on

44  the plaintiff's behalf, on January 4, 2011, CIVIL ACTION NO. 3:14-CV-2958-B. The judge

45  granted the hospital's motion for summary judgment on April 26, 2012, due to a lack of the

46  plaintiff's evidence, ("Exhibit D").

47         The plaintiff resided in New York at the time of the final judgment. Plaintiff initiated

48  conversation with the defendant after learning of the summary judgment decision online.

49  Plaintiff asked his attorney why he did not inform plaintiff of the decision and, what was the

50  status of the case.

51         The defendant did not respond to the plaintiff's direct questions. Defendant did, however,
52   inform the plaintiff that there was no way to fight the summary judgment by appeal or rehearing
53   and, that any other claims against the defendant were now thrown out due to the summary
54   judgment decision. Plaintiff was unaware that the defendant did not use a single piece of his
55   evidence to pursue any legal theory against the hospital.

56   **VI. BACKGOUND**

57         Plaintiff was an internal medicine resident at Dallas Methodist Hospital from July 2007 to
58   May 2010. Of note, plaintiff was a licensed physician by the TMB in 2010, dependent on the
59   hospital giving him staff privileges to earn a living. Plaintiff was entitled to due process during
60   the hospital's proceedings to terminate his employment (*Guerrero v. Burlington County Mem.*
61   *Hospital*, 70 N.J. 344 (1976).

62         Dr. Manuel Rivera, MD was employed by the hospital as the designated institutional official
63   for the ACGME during the plaintiff's residency.

64         Leigh Hunter, MD was employed by the hospital as director of the internal medicine
65   residency program. Drs. Raymond Munoz, MD and, David Rosenstein, MD were employed by
66   the hospital as internal medicine faculty in 2009 and 2010.

67         Plaintiff wrote a letter to the DIO in November of 2009 complaining of harassment he
68   received from Drs. Hunter, Munoz, and, Rosenstein, ("Exhibit B").

69         The harassment plaintiff received from Dr. Leigh Hunter, MD did not stop following his
70   complaint to the DIO, including Dr. Hunter's refusal to grant plaintiff two weeks of vacation.

71         On May 6, 2010, the plaintiff made a formal complaint of harassment to the ACGME
72   regarding several issues including: the treatment he received from Dr. Leigh Hunter, MD,
73   throughout his entire residency, her refusal to grant him vacation, and the DIO's neglect in
74   resolving the conflict, ("Exhibit E").

75         The ACGME contacted the DIO in regard to the complaint made by plaintiff in May 2010,
76   (Exhibit F").

77         The DIO met with the plaintiff on May 19, 2010, and, asked the plaintiff to submit to mental
78   health screening. The DIO stated the reasons for the testing was because plaintiff wrote
79   unauthorized orders and failed to return Dr. Hunter's pages.

80         The plaintiff asked to see the orders he wrote but, the DIO refused to disclose them.

81         The DIO provided the plaintiff a suspension letter on May 20, 2010. The letter contained
82   false representations claiming plaintiff wrote unauthorized orders and, failed to return Dr.
83   Hunter's pages.

84   The plaintiff met with the Dallas Methodist Hospital Executive Committee of Graduate
85   Medical Education, ("GMEC"), on May 20, 2010. The plaintiff made an audio recording of the
86   meeting, ("Exhibit A").

87   The GMEC did not include a peer of the plaintiff's on the committee as required by the
88   ACGME, did not disclose evidence it used to justify its decision, did not review the medical
89   records to verify the unauthorized order allegation and, did not allow plaintiff to defend himself
90   against his accuser, Dr. Leigh Hunter, MD.

91   The meeting was held two weeks after plaintiff made a complaint to the ACGME.

92   Plaintiff was suspended by the defendant following the GMEC meeting and, ultimately
93   terminated from his employment.

94   ## VII. BREACH OF FIDUCIARY DUTY

95   Breach of fiduciary duty includes: the existence of a fiduciary relationship between the

96   plaintiff and defendant; the defendant breached this duty and; the defendant's breach proximately

97   caused injury to the plaintiff (*Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App. - Dallas 2006)).

98   "Proximate cause produces particular, foreseeable consequences without the intervention of any

99   independent or unforeseeable force (*Skinner v Square D Co*, 445 Mich 153, 163; 516 NW2d 475

100  (1994))."

101  ### Count I: US District Court- Evidence Omission

102  <u>Duty</u>: Defendant owed the plaintiff a duty to reasonably represent him in Docket 3:11-

103  CV-0017-B. "A lawyer in Texas is held to the standard of care which would be exercised by a

104  reasonably prudent attorney. The jury must evaluate his conduct based on the information the

105  attorney has at the time of the alleged act of negligence (*Cosgrove v. Grimes*, 774 S.W.2d 662,

106  665 (Tex. 1989))."

107  <u>Breach</u>:  In response to the hospital's motion for summary judgment made in January

108  2012, the reasonably prudent attorney would have been aware of the plaintiff's need to provide

109  evidence of such a quality that a jury could reasonably base a verdict in his favor. Defendant was

110  aware of and, had in his possession, more than a mere scintilla of such evidence to defeat the

111  motion, ("Exhibits A, B"), but, he purposely withheld it from the court. Counsel did not admit

112  the plaintiff's evidence throughout the duration of Docket Number 3:11-CV-0017-B.  The audio

113  recording, proved the hospital's blatant due process and, ACGME violations including violation

114  of ACGME policies: I.B.3.a) and, IV.C1.b), ("Exhibit G"). Of note, the plaintiff's complaint

115 made to the DIO has the defendant's law firm insignia at the top indicating that he had it in his
116 possession in October 2010, ("Exhibit B"). Counsel breached his duty to act as a reasonably
117 prudent attorney in not attempting to defeat the summary judgment with the evidence he had.

118      Causation: Because of defendant's omission, the judge granted the hospital's motion for
119 summary judgment in April 2012, basing her decision on the lack of plaintiff's evidence,
120 ("Exhibit D"). Without counsel's intervention, it was foreseeable the judge would find the
121 plaintiff made baseless assertions without the support of evidence. Defendant did not pursue
122 the plaintiff's claims in a "prudent" fashion.

123      Damages: The plaintiff was unable to secure his rights against the hospital because of
124 defendant's breach of fiduciary duty rather than the legitimacy of the case. The judge assumed
125 the plaintiff had no evidence to support his claim. The plaintiff is entitled to relief.

## VIII. DAMAGES

127      Plaintiff sustained the following damages as a result of the actions and/or omissions of
128 Defendant described hereinabove:

129    a. Actual damages;
130    b. All reasonable and necessary Attorney's fees incurred by or on behalf of the Plaintiff;
131    c. All reasonable and necessary costs incurred in pursuit of this suit;
132    d. Damage to reputation;
133    e. Emotional pain;
134    f. Inconvenience;
135    g. Loss of enjoyment of life;
136    h. Mental anguish in the past;
137    i. Mental anguish in the future;
138    j. Loss of earnings in the past;
139    k. Loss of earning capacity which will, in all probability, be incurred in the future and;

140    l. Prejudgment and post-judgment interest at the highest rate allowed by law.

## IX. EXEMPLARY DAMAGES

142      Plaintiff would further show the acts and omissions of the Defendant, Ray Jackson,
143 complained of herein were committed with malice or reckless indifference to the protected rights
144 of the Plaintiff. In order to punish the Defendant, Ray Jackson, for engaging in unlawful business
145 practices and to deter such actions and/or omissions in the future, Plaintiff also requests recovery
146 from the Defendant for exemplary damages at the highest rate allowed by law.

147

Plaintiff is seeking damages in the amount of: $2,000,000.00

The amount sought in the original action 3:14-CV-2958-B filed on 1/4/11

5/7/15

## X. PRAYER & REQUEST FOR TRIAL BY JURY

148

149   **WHEREFORE, PREMISES CONSIDERED**, Plaintiff, Jason Simmons, respectfully prays
150   the Defendant, Ray Jackson, be cited to appear and answer herein, and that upon a final hearing
151   of the cause, judgment be entered for the Plaintiff against Defendant for damages in an amount
152   within the jurisdictional limits of the Court; exemplary damages, together with interest as
153   allowed by law; costs of court; and such other and further relief to which Plaintiff may be
154   entitled at law or in equity. Plaintiff hereby requests trial by jury.

155         I, the undersigned swear under oath that the stated facts and referenced "Attachments" in
156   the Plaintiff's Original Petition are true and correct, are admissible, are within my personal
157   knowledge, and I am competent to testify,

158
                                              ABRAHAM PATELSKY
                                          Notary Public, State of New York
159                                              No. 01PA6146583
                                             Qualified in Kings County
                                        My Commission Expires May 22, 2018
160   PLAINTIFF

161                              SIGNED under oath before me on  5/7/2015

162
163   ## XI. CERTIFICATE OF CONFERENCE

164         I certify that I have conferred with Attorney Raymond Jackson, about the merits of this
165   Complaint and Raymond Jackson is aware of it.

166

167

168   Plaintiff-Jason Simmons

169   **Conference as follows:**

170   Via email to: **rayjay1911@yahoo.com**

171   Ray Jackson

172   Texas State Bar:

173   **Ray Jackson**
174   **The Jackson Law Firm**
175   **3838 Oak Lawn, Suite 1350**
176   **Dallas, Texas 75219**
177   **214-651-6250**
178   **214-651-6244 facsimile**
179   **rjackson@jacksonfirm.net**
180

## XII. CERTIFICATE OF SERVICE

On this 7th day of May, 2015, I hereby certify that a true and correct copy of the foregoing Complaint and has been served on the following individuals at the location in the manner indicated below:

**BY CERTIFIED MAIL RETURN RECEIPT REQUESTED TO:**

**Ray Jackson**
**The Jackson Law Firm**
**3838 Oak Lawn, Suite 1350**
**Dallas, Texas 75219**
**214-651-6250**
**214-651-6244 facsimile**
**rjackson@jacksonfirm.net**


_____
Plaintiff-Jason Simmons

417 Myrtle Ave

PO BOX #2

Brooklyn, NY 11205


**PLAINTIFF HEREBY REQUESTS TRIAL BY JURY**

EXHIBIT A

Audio recording made by plaintiff, Jason Simmons, MD on May 20, 2010.

Members of the GMEC heard on the recording are listed as follows:


Dr. Stephen Patrick, MD

Barbara Turner, Administrator

Bill Smith, Administrator

Dr. Stephen Hines, MD

Dr. Manuel Rivera, MD

Dr. Leigh Hunter, MD

Dr. Ernest Dunn, MD



I, the undersigned swear that "Exhibit A" is a copy of the original recording made May 20, 2010. The contents are true and correct, are admissible, are within my personal knowledge, and I am competent to testify,

*EXHIBIT A - Transcript*

1                                                    . recorded.   We

2   don't want it recorded.

3               DOCTOR SIMMONS:   If everything's out -- if

4   everything's out in the open, I don't see why it can't be

5   recorded.

6               MALE #2:   I don't want it recorded.   That's not

7   the routine that this (inaudible).   We don't record anything

8   else.   So we don't want it recorded today.

9               MALE:   That's the letter that was in here

10  yesterday, that's the letter of suspension, that's just in

11  case you didn't get it.   I would just want to make sure that

12  you have that.   We just introduced it to me when I was here

13  and I'm just not sure that we don't have the recorder on

14  because we don't want this being recorded.   This is mainly

15  just to discuss some issues that the community has and they

16  want an answer from you.   So, let me just start, Doctor

17  Patrick, do you want to -- let's just go around and we'll get

18  the (inaudible) from the residency, that would be good.

19               (Parties introduce themselves)

20               MR. RIVERA:   And I'm Paul Rivera, I'm the DIO and

21  (inaudible).

22               (Inaudible):   (Inaudible).

23               MR. SPENCER:   Bill Spencer, attorney of record

24  (inaudible).

25               INAUDIBLE VOICE:   (inaudible) co-defendant.


1    MR. JOHNSON: Bert Johnson, (inaudible).

2        MALE: So this is the Executive Committee for GME

3 and this meeting was called by the Executive Committee for

4 GME. This is your refusal to discuss any issues (inaudible)

5 order DIO. The ECGME (inaudible) in order to recommend

6 certain (inaudible) and a possibility of conducting the case

7 with the (inaudible) which is coming up, Tuesday, May 25th.

8        Let me just start by saying that what we want is

9 just to state what issues are pending and we want to hear what

10 you we have say about those issues. And then after that, the

11 committee will discuss and then we take action to it,

12 recommendations or a possible discussion by ECGME.

13        The issues that we need to discuss are -- the

14 questions I have that are pending are the failures to answer

15 pages from -- of the quote, unquote, (inaudible) institutional

16 (inaudible) as far as the program director. So, (inaudible),

17 failures to respond to calls or pages -- pages as they have

18 asked you. We want to know what other issues of the guidebook

19 (inaudible) rights to it.

20        DOCTOR SIMMONS: I have no issues. I returned

21 all pages I received.

22        MALE: So, you return all the pages?

23        DOCTOR SIMMONS: Yes, I did. So, for you -- I

24 mean, especially you're taking the word of someone who has

25 recently internally investigated and they're just taking their

1  word for it that I didn't return pages.  There's records

2  throughout the hospital of me writing notes.  I've been here

3  the whole entire time, I've been living up to my

4  responsibilities, so.

5          MALE:  (inaudible) hear from you.  We're here not

6  to discuss it -- discuss any information from my investigation

7  or (inaudible).

8          DOCTOR SIMMONS:  Why can we not discuss any

9  issues from your investigation?  Because it relates -- it

10  relates to all of this?

11          MALE:  The Executive Committee calls a meeting

12  with an agenda which is the agenda of the Executive Committee,

13  not the agenda of a person that we called to the Executive

14  Committee meeting.  So, if you would please answer what those

15  issues are, what your point is?

16          DOCTOR SIMMONS:  Oh, there are no issues.  I

17  returned -- I returned all the pages I received.  I saved my

18  pages and I will provide to you pages with her signature and

19  number at the end and a page goes directly to fax.  She's

20  paged me the fax numbers.

21          DOCTOR HENNER:  (inaudible) multiple times.

22          DOCTOR SIMMONS:  And I -- I have other pages that

23  are saved and other numbers that are non-existent where no one

24  answers the phone.  This is -- we're on -- onto what, the

25  twenty (inaudible) rotation.  I spend the first half of

1   rotation with a colleague and there were no issues.  There's

2   been no issues for two years, ten months and one week of my

3   being here.  I go on rotation with the person he recently

4   investigated and she says this is what happened and you just

5   sent this to me.  It's not going to hold up, sir.  You know

6   it's not.

7               MALE:  Did you answer the pages?  Your statement

8   to that is that you answered all your pages?

9               DOCTOR SIMMONS:  Absolutely.  I wouldn't have

10  made it to two weeks left before I graduated if I don't answer

11  my pages.

12              MALE:  In your --

13              DOCTOR SIMMONS:  I think the issue would have --

14  the argument addressed to find out my history of not answering

15  my pages.

16              MALE:  (inaudible) service on --

17              DOCTOR SIMMONS:  Did Doctor Shake report this

18  problem?

19              MALE:  (inaudible).

20              DOCTOR SIMMONS:  Did Doctor Shake report this

21  problem?

22              DOCTOR HENNER:  Yes.

23              MALE:  There is a 5-11 report that you did not

24  see a consult and that you reported that Doctor Shake had

25  released you from the service and that you turned the pager

1  off.  We have reports back that -- we have reports back that

2  Doctor Shake had not released you from the service and that --

3         DOCTOR SIMMONS:  Not from the service, he

4  released me from the day -- for the day.

5         DOCTOR HENNER:  He did not.  He did not, sir.

6         DOCTOR SIMMONS:  Well, I mean, it's -- he

7  said/she said, it's just what this is going to turn into on

8  top --

9         MALE:  Doctor Simmons?

10        DOCTOR SIMMONS:  Yes, sir.

11        MALE:  You say -- you stated that he released you

12 from that -- that (inaudible) Novak?  The afternoon of May

13 17th, you saw a consult that you're referring.  There's a

14 report also that you did not discuss this with your

15 supervising attending and you wrote file recommendations and

16 words on that case.  Do you remember that?

17        DOCTOR SIMMONS:  Yes, I do and the last line,

18 we'll discuss case with Doctor Hanart (phonetic).  I didn't

19 write, follow recommendations.  I didn't write orders.  I

20 didn't change anything -- it's right there in the chart.

21        DOCTOR HENNER:  You wrote recommendations on the

22 consult.  You (inaudible) letter from me consult.  I would

23 have found out the next day, is when you told (inaudible).

24        DOCTOR SIMMONS:  Again, sir, I -- you've seen my

25 CV, you've seen how decorated I am.  You've seen where I'm

1   headed.  We get to this two weeks left and someone who you

2   just had to investigate is saying something against me.

3                    MALE:  (inaudible).

4                    DOCTOR SIMMONS:  That's fantastic but I'm just --

5   I'm just trying to establish credibility here.

6                    MALE:  On the 17th, there is a report that you

7   were (inaudible) labor and delivery about 4:30 in the

8   afternoon and that you did not answer back for an I.D.

9   consult.  Do you remember that?  Do you remember --

10                   DOCTOR SIMMONS:  Yeah, I was in the process of

11  filling out the consult and I discussed with the -- who is the

12  OB person, I don't know the name (inaudible).  I discussed

13  with one of your residents and I'm sure that they can tell you

14  I was down there in IC talking to him about the case.  It was

15  a lady who got here, she presented at 20.5 weeks.  She's

16  suggestive -- she wanted everything done to try and salvage

17  her pregnancy.  She had a fever.  I started to write the

18  consult.  She went home with (inaudible) antibiotics.  She

19  came back, that failed.  She delivered a dead fetus.

20  Diagnosis is (inaudible).  Doctor Henner recommended

21  (inaudible).  I was in the process of writing that note and

22  that's when Doctor Henner called me and told me you're off my

23  service.  So, that's the explanation for that one.

24                   DOCTOR HENNER:  That's the (inaudible).

25                   MALE:  Do you remember --

1    DOCTOR HENNER:  (inaudible).

2    MALE:  Do you remember the name of the OB

3    resident?

4    DOCTOR SIMMONS:  I could (inaudible).  I don't

5    know her name.

6    MALE:  A female or a male?

7    DOCTOR SIMMONS:  She's a female.  There are

8    actually two of them there.  I could point them out, I don't

9    know their names.

10    MALE:  Okay.

11    DOCTOR HENNER:  But the point is, you did not

12    answer the day before when I saw her.  You saw the patient the

13    next morning when Amy notified --

14    DOCTOR SIMMONS:  Again, Doctor Henner, you never

15    paged me.  You'll notice you never page me.

16    MALE:  Well, there's another item here --

17    DOCTOR SIMMONS:  Go back and look in your cameras

18    at the hospital where I'm at.  I was sitting right in the

19    hospital until 5 o'clock on these stated days.  Go back and

20    review the records.  I was here in the hospital waiting to

21    work.

22    MALE:  There is another issue here.  Some days

23    back, probably a week before this, when you were supposed to

24    be in the clinic.  The report says that you went to the

25    clinic, you left the clinic and they called you back.  You

1  asked -- they were asked -- they asked you where you were.

2  You told them that you were in a meeting with me.

3          DOCTOR SIMMONS:  I did not say that.

4          MALE:  And -- well, that's what I have stated,

5  that's what you stated --

6          DOCTOR SIMMONS:  All you have is he said/she

7  said, sir, so I mean --

8          MALE:  (inaudible).

9          DOCTOR SIMMONS:  -- if that's what you're going

10  to continue to read off, that's fantastic.  I never said that.

11          MALE:  You didn't say that?

12          DOCTOR SIMMONS:  I never said I was in a meeting

13  with you?

14          MALE:  You stated you were in a meeting with me.

15          DOCTOR SIMMONS:  No.

16          MALE:  Okay.  Okay.  The last one we have is just

17  that yesterday after our meeting, (inaudible).  I'm sorry,

18  after our meeting across the street, you saw Doctor Pantry

19  somewhere in the hospital.  And you told me that you told him

20  that you had been drug tested and that you were going to

21  compare that to --

22          DOCTOR SIMMONS:  I told you yesterday that I was

23  drug tested?

24          MALE:  (inaudible) said yes.

25          MALE #2:  Oh, it was Tuesday.  Not yesterday, it

1  was on Tuesday.

2         DOCTOR SIMMONS:  Yesterday about 11:30 in the

3  morning.

4         MALE:  (inaudible).  You told me that you had

5  been drug tested at your (inaudible) and that you were

6  scheduled for a drug --

7         DOCTOR SIMMONS:  My goodness.

8         MALE:  -- (inaudible).

9         DOCTOR SIMMONS:  This is going to turn into he

10  said/she said, that's all you have, sir.

11         MALE:  You said that you were happy to do the

12  test, both tests, because then you would be able to compare

13  the result (inaudible) to the one that you did.  (inaudible).

14         DOCTOR SIMMONS:  Doctor (inaudible), is that

15  consistent with what I said to you twenty minutes before, no,

16  I will not give you a drug test because I'm scheduled to do a

17  drug test on Monday.  I don't want you guys taking a sample

18  from me because I don't want you guys supposedly to continue

19  with -- similar to what you're doing right now to say

20  something's in my urine.  So you can compare it to JPS's.  I

21  told you I would meet with you on Monday and I'll give you a

22  sample on Monday so you can compare the two.  I never told you

23  I already tested, that's twenty minutes later.

24         MALE:  (inaudible), you said you had been drug

25  tested.  You had the results to compare them.

1      DOCTOR SIMMONS:  No, that's -- okay, that's what

2   this is.

3      MALE:  Those are the items that I have that the

4   Executive Committee wanted me to ask.  As far as, is there

5   anything else that the Executive Committee wants to

6   (inaudible) talk to him about, items that I am missing from

7   what I wrote down that I previously (inaudible)?  Can you

8   think of anything else?

9      DOCTOR HENNER:  (inaudible).

10     MALE:  No?  (inaudible) you said (inaudible) said

11  that the Executive Committee will go ahead and discuss these

12  items and your answers to this, these questions that they had.

13  And you continue to be suspended.  We will discuss this and

14  the Executive Committee will come up with some action plan and

15  I will communicate with you back as soon as we have that

16  decision (inaudible).

17     DOCTOR SIMMONS:  Can I ask you a few questions?

18     MALE:  No (inaudible).  Okay?

19     DOCTOR SIMMONS:  I didn't say -- I'm not saying

20  that --

21     MALE:  (inaudible) and you said no.  Why would he

22  do that?  Why would he make that up?  I just need an answer.

23  He's lying.  Why is he lying and said you said something that

24  didn't have (inaudible).

25     DOCTOR SIMMONS:  I don't know why he did that,

1   for some reason --

2              MALE:  Because he's not here.

3              DOCTOR SIMMONS:  Sir, the same reason -- the same

4   reason why I don't know why Doctor Henner is stating that she

5   has paged me when she knows she hasn't.

6              MALE:  So I'll (inaudible) two of them are lying.

7   It's kind of interesting, don't you think?

8              DOCTOR SIMMONS:  That's very interesting, yeah.

9              MALE:  I guess you would have to come up with a

10  reason for it, though.

11             DOCTOR SIMMONS:  Yeah, I would.

12             MALE:  Well, okay, it is.

13             DOCTOR SIMMONS:  Can you explain to me for three

14  months, he's not going to respond to me that the -- the

15  complaints that I have, the proof?

16             MALE:  I asked a very specific question about a

17  very specific incident.

18             DOCTOR SIMMONS:  To protect the house is my

19  answer, that's the answer.

20             MALE:  (inaudible).

21             DOCTOR SIMMONS:  To protect Doctor Henner, to

22  protect Doctor Rivera.  I mean, you're not going to -- she's

23  not going sit here -- he's not going to sit here --

24             MALE:  Protect (inaudible).

25             DOCTOR SIMMONS:  -- and corroborate a story for

1   me that proves her guilt, I mean, that's not going to happen.

2           MALE:  (inaudible)  I think these stories is an

3   irrelevant event.  This has nothing to do with anything else

4   on the table except he said something, you said that he's

5   lying.  Now, why is he lying?

6           DOCTOR SIMMONS:  I have given you my answer.

7           MALE:  No, you gave me no answer.  There's no

8   answer.

9           DOCTOR SIMMONS:  Right, I think it makes great

10  sense, my answer.

11          MALE:  Well, I explained to you the process that

12  we're going to take and I think that we're -- the Executive

13  Committee will discuss it and then we'll --

14          DOCTOR SIMMONS:  So what are the actual reasons

15  why I'm on suspension now?  Could you state them for me?

16          MALE:  (inaudible).

17          DOCTOR SIMMONS:  Okay.  Can I -- can I have a

18  copy of the findings that you had from your investigation that

19  you announced to everyone forty-eight hours ago?

20          MALE:  (inaudible).

21          DOCTOR SIMMONS:  Why not?

22          MALE:  Because I'm stating to you no.  That's not

23  the process.

24          DOCTOR SIMMONS:  Because why?

25          MALE:  That's not the process.

1   DOCTOR SIMMONS:  Doctor Dunn, do you think that

2   that's a fair answer?  We conduct -- we conducted an internal

3   investigation --

4   MALE:  (inaudible).

5   DOCTOR SIMMONS:  -- of Internal Medicine.  He has

6   several emails from him saying that I will get back to you in

7   two weeks.  I will publish my results.  These are public

8   knowledge.  So why at this point can I not have a copy of what

9   he wrote on me?

10   MALE:  (Inaudible) hospital -- the hospital has

11   set policies which we have to follow.  (inaudible) policy we

12   have to follow.

13   DOCTOR SIMMONS:  Okay.  Fantastic.  Can I have

14   someone escort me up to the Legal Office because I know people

15   are afraid that I'm going to do something.  Can you have a

16   policeman here take me up to the Legal Office?

17   MALE:  The Legal Office?

18   DOCTOR SIMMONS:  Yes, sir.

19   MALE:  (inaudible)?

20   DOCTOR SIMMONS:  No but I can -- don't I have the

21   right to make one?

22   MALE:  You sure do.  Okay.

23   (End of Conversation)

24   * * * * * * * *

25



14

## C E R T I F I C A T E

This is to certify that I have typed the above record from an audio file(s) produced from an electronic sound recording system in the State of New York and that to my best knowledge and belief the above record as typed by me is a true and accurate record of the audio file(s).

John Valente

John Valente

Mechanical Secretary, Inc.
Molly's Prof. Typing Service

108-16 72nd Avenue
Forest Hills, NY 11375

June 19, 2014

*[handwritten: 2009 Harassment]*

*[handwritten: → You have copies]*

*[handwritten: EXHIBIT B]*

*[handwritten: IN POSSESSION OF JACKSO not incl in His email sent 8/12/13]*

I hope the email that Dr. Hunter received stating I laughed at the patient while the hospital committee tried to resolve the situation includes a few details. For example, I had the full blessing of my attending to discharge the patient without narcotics and imaging as evidenced by the conversation I had with him over speaker phone so those interested could hear. The patient became so inflamed after I reviewed the chart with her that showed EMS reports, nursing reports, ER doctor's orders, initial H&P all reflected a chief complaint of chest pain. She also tried to insist that I was not her doctor and hadn't seen me during rounds that morning

I did tell the patient that she could be escorted out by the police and did not apologize for doing so. This was only after I explained to her over the phone from home that the reason she came to the hospital was evaluated. She was aware of discharge planning per our morning discussion with the team and if she does indeed have low back pain she can have it addressed as an outpatient. When she did not like my response she proceeded to tell me what I needed to do for her as a doctor. I explained again our reason for discharge, the fact that I could have her escorted out but would prefer to talk to her face-to-face. When I arrived at the hospital, reviewed the chart with her the situation escalated.

I am unaware of any avenue in this hospital for residents to evaluate the professionalism, let alone defend themselves from these committees who have the right to negatively impact our track record. Yet everyone gets to scrutinize us. I am going to dare suggest that this email was written: 1.Based on false information of actual events 2. In effort to smear my reputation.

The medical students that I work with have collectively given their opinion of me as a physician in honoring me with the Humanism and Excellence in Teaching Award.

If you survey my patients I think you would get a consistent opinion about my level of care as is reflected in my record of evaluations held by Dr. Hunter. I have also received the Methodist Hospital's Tell Us Who's Great Award via patient nomination.

I am unaware of a long list of morbid and or mortal outcomes in treating my patients since I have been here.

When taking all these points into consideration one has to ask, "Where is the disconnect?"

Is Dr. Simmons being judged by Dr. Hunter and hospital committees subjectively, arbitrarily? Are the recent email and propaganda campaign by the program director efforts resulting from subjective feelings?

I refuse to take part in the Dr. Hunter Propaganda Machine. Please feel free to tell her that is the primary reason I did not want to be her chief. Maybe this will put an end to her sending her foot soldiers to extract information from me. I refuse to work along side some members of this faculty, particularly the home-grown ones, who pass as educators. I refuse to help these individuals carry out campaigns where *disfavored* residents are

10/05/10   10:23AM   THE JACKSON LAW FIRM   2146516244   EXHIBIT B

*Previous*
*[?] Harrassment*
*q/o*
*11/4/09*

*written 11/09*
*in response to Resident*
*held by Dr. Hunter*

Dr. Rivera,

I am writing in response to the meeting held by Dr. Hunter on Wednesday, October 28 2009. During this meeting she discussed an incident occurring between a patient and resident on 4 North earlier that month. She assumed the discussion was anonymous. Despite her assumption, the residents are very aware of the faculty's opinion of me and their tireless effort to inflate and broadcast any of my mistakes. As recently as September Dr. Munoz, as my attending, openly discussed in front of my team and whomever else in earshot the insignificant details he and Dr. Rosenstein found in my charts of discharged patients. He requested that I explain the discrepancies before we started rounds. This was done on more than one occasion at nursing stations.

As she reviewed the case of a 30yo woman admitted to 23hour observation for chest pain rule out, her discussion was littered with false statements. The things she stated:

1. Patient had chronic history of low back pain
2. Patient was discharged late in evening on the weekend with no where to go
3. Patient was unfunded
4. Resident's lack of compassion kept them from considering above before activating discharge
5. Resident laughed at patient as discharge planning was explained to patient
(If she attempts to lie to you and suggest she did not have these discussion points please remind her she addressed 20-25 resident-physicians, not sheep or children, that day)

To begin, patient received MRI on 10/16/09 of her cervical and thoracic spine (not lumbar). The indication for these studies was arm numbness, left shoulder pain, and cervical radiculopathy. All scans were clinically insignificant.

Second, patient was discharged on 10/14/09 which was a Wednesday. She was aware of the discharge by rounds that morning as discussed with her by the primary team. Discharge orders were signed and dated at 11:10 am.

Third, the patient was not unfunded. She is employed by a national bank and has a major health insurance provider. She lives at home.

At 4 pm on the date of discharge when the patient demands IV narcotics and imaging for her low back pain, I don't believe my refusal to do so reflects a lack of compassion. To suggest that I gave suboptimal medical care to this patient is malicious. To give my current and future colleagues, future treatment partners, future referral base the idea that I don't care about patients is even worse. I am aware that in a professional setting such as this, terms like *slander* and *defamation* apply.

In regard to the fifth point, I will attempt to tell my side of the story. I am aware that in this hospital when whatever non-physician committee is involved the resident's side is rarely heard or considered but I will try.

*EXHIBIT B*

2009
Harassment

objectified while those in her "cabinet" receive pardons for equal and worse mistakes. *Disfavored* residents are given different "tracks" to complete to graduate. I don't believe control-by-fear tactics best apply to a residency program where adults are supposed to be educated.

I am aware that I can be a polarizing person. I had to accept this before setting foot in this hospital. I do not look for people to like me because often time their tendencies sway them the other way. I do not know if it is possible for me to care less about what this faculty or hospital committees think of me. I don't believe that is why I am here. I do take offense to attacks on my professional character and for these I will defend myself.

It is upsetting that personal attacks have now resulted from the events occurring at the end of last year. It is amazing how I have become the bad guy for REACTING to a situation. Why aren't the individuals who created the situation the "bad guy?"

It seems as though I fight the temptation each day to meet with you before my exit interview. I have several theories on the "state of things" here at Methodist and suggestions for change. I do not believe that if I shared with you all of the goings on of this internal medicine program, particularly the FULL story of my interactions with her and her faculty, you would be impressed. In fact, I think you would be disgusted. Her trying to pull off stunts like this gives me no reason to fight that temptation any longer.

Sincerely,

Jason Simmons



*EXHIBIT C*

## Re: Jason Simmons- MORE ?s

4 messages

---

**Jason Simmons** <jsimmsmd@gmail.com>                     Thu, Nov 11, 2010 at 4:07 AM
To: ray jackson <rayjay1911@yahoo.com>
Cc: ccienfuegos@jacksonfirm.net

Please see the document attached. I cut and paste a few definitions to help explain my questions.
Thanks



-jason

 **Breach of contract1.doc**
37K

---

**Jason Simmons** <jsimmsmd@gmail.com>                     Mon, Nov 15, 2010 at 4:35 PM
To: ray jackson <rayjay1911@yahoo.com>
Cc: Cristal Cienfuegos <ccienfuegos@jacksonfirm.net>

*-see attachment*

Here are the names that I left out from the last email. I think this is my final question.  : )

-jason

**Amit Pate1.doc**
33K

**EXHIBIT D**

UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF TEXAS DALLAS DIVISION

JASON SIMMONS § § Plaintiff, § § v. § CIVIL ACTION NO. 3:11-CV-0017-B § METHODIST HOSPITALS OF DALLAS, § § Defendant. §

MEMORANDUM OPINION AND ORDER

Before the Court is Defendant's Motion for Summary Judgment (doc. 12), filed January 27,

2012. In the Motion, Defendant argues that Plaintiff has failed to present a prima facie case of

discrimination, and further that he has failed to rebut Defendant's claims that he was fired for

legitimate, non-pretextual reasons. For the reasons stated below, Defendant's Motion is hereby

GRANTED.

I.

BACKGROUND

This is an employment discrimination case that arises from Plaintiff's service as a resident

physician. Beginning in July 2007, Plaintiff Jason Simmons served as a resident in Defendant

Methodist Hospitals of Dallas' ("Methodist") Internal Medicine Residency Program. Def.'s Mot. for

Sum. J. ("Def.'s Mot.") 4. The Internal Medicine Program (the "Program") is a three year program

that admits nine residents each year. Id. at 5. The Program requires its residents to complete a certain

number of elective and mandatory rotations during a residency. Id. These rotations are scheduled

- 1

Simmons v. Methodist Hospitals of Dallas Doc. 31

Dockets.Justia.com

by two Chief Residents and a Program Director. Id.

As a resident, Simmons agreed to comply with a number of policies and guidelines pertaining

to his conduct. Id. at 4. For example, Simmons was required to sign a Resident Physician Agreement

for each of his three years of training at Methodist. Id. On June 7, 2009, Simmons signed the

Agreement for the 2009-10 training year. Id. He also agreed to abide by the terms of the Employee

Handbook as set forth by the Graduate Medical Institution and Program manuals, as well as the

Methodist Hospitals of Dallas Internal Medicine Residency Program Policies and Guidelines. Id.

Simmons received a copy of both of these manuals. App. to Def.'s Mot. 23-24.

During his residency, Simmons' direct supervisor was Dr. Leigh Hunter, the Program Director

of the Internal Medicine Residency Program. Def.'s Mot. 4. Dr. Hunter reported to Dr. Manuel

Rivera, the Assistant Vice President for Graduate Medical Education at Methodist. Id. Methodist's

residency programs are governed by the Accreditation Council for Graduate Medical Education

("ACGME"), an independent accrediting organization that evaluates residency programs in the

United States. Id. The Graduate Medical Education Committee ("GMEC") is the top Methodist

committee that runs all graduate medical education at Methodist and includes approximately twenty

members, including two elected residents from each program. Id. at 5.

Simmons alleges that in spring of 2010, he began to have conflicts with other doctors in part

due to miscommunication and also due to a failure of Dr. Hunter and Dr. Rivera to accommodate

his requests. Compl. 2-3. On March 22, 2010, Simmons requested that some of his vacation time,

originally scheduled for June 2010, be rescheduled to May. Def.'s Mot. 15. Dr. Hunter responded

that Simmons would be unable to take off that requested time because doing so would mean that he

would violate Methodist's vacation policy. Id. On May 14, Simmons met with Dr. Hunter and Dr.

- 2

Rivera to discuss which dates he might be able to take a vacation. Id. When he attempted to bring

up other topics, Dr. Rivera left the meeting. Compl. 3. Simmons also alleges that he was falsely

accused of failing to attend his rounds at the hospital as scheduled when he was actually attending

meetings with Dr. Rivera. Id. On May 17, Simmons was informed that Dr. Hunter wanted to meet

with him, but Simmons refused to meet with her alone and requested that Dr. Rivera attend the

meeting. Id. Then, on May 19, Simmons was called to a meeting with Dr. Rivera, who questioned

him about having failed to attend his rounds or to respond to Dr. Hunter's pages. Id. Thereafter,

Simmons was asked to take a urine test, which he refused. Id. at 3. Consequently, Dr. Rivera formally

suspended Simmons. Id.

One day later, on May 20, 2010, Simmons met with the Executive Committee of the GMEC

("Executive Committee") concerning the conflicts that had arisen. Def.'s Mot. 22. Simmons denied

any issues or concerns that the Executive Committee raised. Id. After the meeting was over, the

Executive Committee unanimously decided that the suspension should remain intact and that the

recommendation should be made to the GMEC to terminate Simmons' employment. Id. On May 25,

the GMEC met to consider the recommendation, and it decided that Simmons should not be

permitted to graduate from the Program. Id. at 23. Simmons then appealed the decision to the

President and Chief Executive Officer of Methodist Health System of Dallas, Dr. Stephen Mansfield.

Id. Dr. Mansfield met with Simmons and reviewed the applicable documentation before deciding to

uphold the decision. Id.

Simmons alleges that, beginning in 2010, Methodist began to discriminate in several different

ways. First, he alleges that Methodist refused to allow him to work a rotation in Rheumatology.

Compl. 2. Second, Simmons alleges that Methodist would not permit him to alter his vacation days

- 3

to the point where he was unable to take any vacation. Id. Third, he alleges that Methodist's program

directors failed to keep an accurate record of Simmons' conference attendance. Id. Fourth, he alleges

that Dr. Rivera incorrectly stated that Simmons had signed a remediation agreement, which he

claims that he never signed. Id. And fifth and finally, Simmons alleges that he was unlawfully

suspended from the program and eventually terminated. Id. at 4.

Simmons filed this lawsuit on January 4, 2011, claiming that Methodist discriminated against

him on the basis of race, in violation of 42 U.S.C. § 2000e and 42 U.S.C. § 1981. Simmons alleges

claims of disparate treatment as well as disparate impact. Id. at 4-5. On January 27, 2012, Methodist

filed a Motion for Summary Judgment (doc. 12). In the Motion, Methodist argues that Simmons

failed to state a prima facie case of disparate treatment, and in the alternative, that Simmons'

allegations of disparate treatment are unfounded because it had legitimate and non-discriminatory

reasons to terminate his employment. Furthermore, Methodist argues that Simmons has failed to

offer any evidence of disparate impact, and has in fact failed to establish a prima facie case of disparate

impact under 42 U.S.C. § 2000e-2(k). On March 2, 2012, Simmons filed a Response that relied

heavily on his deposition testimony in reiterating that he had been discriminated against. The 1

Motion now being ripe, the Court will address the merits of Methodist's claims below.

Simmons' Response additionally argues that he was subjected to a hostile work environment1 because of his race. Resp. 9-11. This claim was not properly pleaded, and Simmons failed to seek leave from this Court to amend his Complaint to add a hostile work environment claim. If a party fails to amend properly as a matter of course, it "may amend its pleading only with the opposing party's written consent or the court's leave." FED. R. CIV. P. 15(a)(2). Given that Simmons did not obtain Methodist's consent, it must obtain leave from the Court. Simmons has not articulated why he failed to amend his pleading properly, or why doing so in his Response to Defendant's Motion for Summary Judgment would not cause undue prejudice to Methodist. Furthermore, the Court finds that this amendment would be futile. See Matter of Southmark Corp., 88 F.3d 311, 314-15 (5th Cir. 1996). Accordingly, the Court denies Simmons the right to add this claim, and therefore his argument that he was subject to a hostile work environment is hereby STRICKEN.

- 4

II.

LEGAL STANDARDS

The purpose of summary judgment is "to enable a party who believes there is no genuine

dispute as to a separate fact essential to the other side's case to demand at least one sworn averment

of that fact before the lengthy process of litigation continues." Lujan v. Nat'l Wildlife Fed'n, 497 U.S.

871, 888 (1990). Accordingly, Federal Rule of Civil Procedure 56(a) provides that summary

judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact

and the movant is entitled to judgment as a matter of law." The substantive law governing a matter

determines which facts are material to a case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986).

The summary judgment movant bears the burden of proving that no genuine issue of material

fact exists. Latimer v. Smithkline & French Labs, 919 F.2d 301, 303 (5th Cir. 1990). However, if the

non-movant ultimately bears the burden of proof at trial, the summary judgment movant need not

support its motion with evidence negating the non-movant's case. Celotex Corp. v. Catrett, 477 U.S.

317, 323 (1986). Rather, the summary judgment movant may satisfy its burden by pointing to the

mere absence of evidence supporting the non-movant's case. Id. When the movant bears the burden

of proving an affirmative defense at trial, "it must establish beyond dispute all of the defense's

essential elements." Bank of La. v. Aetna U.S. Healthcare Inc., 468 F.3d 237, 241 (5th Cir. 2006)

(citing Martin v. Alamo Cmty. Coll. Dist., 35 F.3d 409, 412 (5th Cir. 2003)).

Once the summary judgment movant has met this burden, the non-movant must "go beyond

the pleadings and designate specific facts showing that there is a genuine issue for trial." Little v.

Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994)(per curiam)(citing Celotex, 477 U.S. at 325).

- 5

Factual controversies regarding the existence of a genuine issue for trial must be resolved in favor of

the non-movant. Little, 37 F.3d at 1075.  Nevertheless, a non-movant may not simply rely on the

Court to sift through the record to find a fact issue, but must instead point to specific evidence in the

record and articulate precisely how that evidence supports the challenged claim. Ragas v. Tenn. Gas

Pipeline Co., 136 F.3d 455, 458 (5th Cir. 1998). Moreover, the evidence the non-movant does

provide must raise more than "some metaphysical doubt as to the material facts." Matsushita Elec.

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). This evidence must be such that a jury

could reasonably base a verdict in the non-movant's favor. Anderson, 477 U.S. at 248. If the non

movant is unable to make such a showing, the court must grant summary judgment. Little, 37 F.3d

at 1075.

III.

ANALYSIS

A. Disparate Treatment

Simmons alleges that he was the victim of disparate treatment on the basis of his race in

violation of Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e-2(a)(1) (2006). Title VII

provides that "[i]t shall be an unlawful employment practice for an employer—(1) to . . .

discriminate against any individual with respect to his compensation, terms, conditions, or privileges

or employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C.

§ 2000e–2(a)(1). A plaintiff can "prove a claim of intentional discrimination . . . either by direct or

circumstantial evidence." McCoy v. City of Shreveport, 492 F.3d 551, 556 (5th Cir. 2007). When the

plaintiff presents a case that relies exclusively on circumstantial evidence, the Court will apply the

burden-shifting framework as set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802

- 6

(1973). McCoy, 492 F.3d at 556.

Under the McDonnell Douglas framework, the plaintiff has the in initial burden to come

forward with evidence establishing a prima facie case of discrimination. Reeves v. Sanderson Plumbing

Prods., Inc., 530 U.S. 133, 142 (2000). To make out a prima facie case, the plaintiff must show that he or she "(1) is a member of a protected group; (2) was qualified for the position at issue; (3) was discharged or suffered some adverse employment action by the employer; and (4) was replaced by someone outside his protected group or was treated less favorably than other similarly situated employees outside the protected group." McCoy, 492 F.3d at 556–57. "If the plaintiff makes a prima facie showing, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory . . . reason for its employment action." Id. at 557. "The employer's burden is only one of production, not persuasion, and involves no credibility assessment." Id. Finally, "[i]f the employer meets its burden of production, the plaintiff then bears the ultimate burden of proving that the employer's proffered reason is not true but instead is a pretext for the real discriminatory . . . purpose." Id. To carry this burden, the employee must demonstrate that each stated reason articulated by the employer was merely a pretext for discrimination. Id.

i. Adverse Employment Action

Simmons contends that Methodist discriminated against him in several different respects. The alleged discriminatory acts include the following: (1) Methodist refused to allow Simmons to work a rotation in Rheumatology; (2) Methodist would not permit him to alter his vacation days to the point where he was unable to take any vacation; (3) Methodist's program directors failed to keep an accurate record of Simmons' conference attendance; (4) Dr. Rivera incorrectly stated that Simmons had signed a remediation agreement, which Simmons alleges that he never signed; and (5)

- 7

Simmons unlawfully suspended from the program and eventually terminated. Id. at 4.

The Court must determine whether these allegations constitute adverse actions that amount to a prima facie case of discrimination under Title VII. The Fifth Circuit has held that adverse actions under Title VII claims include "ultimate employment decisions such as hiring, granting leave, discharging, promoting, and compensating." Pegram v. Honeywell, Inc., 361 F.3d 272, 282 (5th Cir. 2004) (emphasis omitted) (citation omitted). Other actions – including disciplinary filings, reprimands, and poor performance reviews – do not constitute adverse employment actions, even as they might affect the plaintiff's future employment. Roberson v. Game Stop/Babbage's, 152 F. App'x. 356, 360 (5th Cir. 2005).

Simmons' Complaint does not make clear which precise actions constitute unlawful discrimination. However, several of his factual allegations are not adverse employment actions. Claims that Methodist did not calculate his attendance correctly or that it incorrectly believed he signed a remediation agreement are not adverse employment actions. They may be examples of differential treatment, but they are not actionable under the Fifth Circuit's analysis of Title VII. Furthermore, the fact that Simmons did not perform a Rheumatology rotation is not an "ultimate employment decision" because it did not affect his status within the Program. See McCoy, 492 F.3d at 559. Nevertheless, the Court will consider Methodist's resistance to permitting Simmons to take vacation days, as well as his eventual firing, as adverse employment actions. Therefore, the Court 2 finds that Simmons has carried his burden to show that he experienced an adverse employment

Simmons provides no legal support for the theory that limiting available vacation days may be2 an adverse employment action, but for purposes of this Order, the Court will assume without deciding that it is. His eventual firing is, of course, an adverse employment action. See Pegram, 361 F.3d at 282.

- 8

action.

ii. Preferential Treatment

To establish the fourth element of a prima facie case for discrimination, Simmons must show that Methodist gave preferential treatment to similarly situated employees outside the protected class. Until the employee produces evidence that similarly situated employees were treated differently, then there is no inference of discrimination for the employer to rebut. See Anthony v. Donahoe, No. 11-30644, 2012 WL 470193, at *3 (5th Cir. Feb. 13, 2012); see also Lee v. Kan. City S. Ry. Co., 574 F.3d 253, 259-60 (5th Cir. 2009) ("The question whether [the plaintiff] presented a prima facie case of racial discrimination turns here on whether either or both of the white engineers identified by [the plaintiff] as comparators were similarly situated to him.").3

Simmons, in both his Complaint and his Response, has offered no facts to suggest differential treatment on the basis of race. Simmons addresses this only by pointing to statements from his from his own Appendix, which includes an affidavit that states plainly that "other non-African Americans were allowed to take their vacation time" and that other residents who made similar mistakes were permitted to graduate. App. to Pl.'s Resp. 22. Apart from Simmons' own testimony, then, within his

Nonetheless, as with other forms of intentional discrimination, providing evidence of "similarly3 situated employees" or that plaintiff was "replaced by an individual outside the protected group" are not the only methods by which a plaintiff may discharge his burden of establishing a prima facie case of intentional discrimination. See Abdu-Brisson v. Delta Airlines, 239 F.3d 456, 467-68 (2d Cir. 2001) ("[A] showing of disparate treatment, while a common and especially effective method of establishing the inference of discriminatory intent necessary to complete the prima facie case, is only one way to discharge that burden."). Simmons may also establish the fourth element of his prima facie case by showing that he was otherwise discharged because of his race. See Lawson v. S. Components, Inc., 410 F. App'x. 833, 835 (5th Cir. 2011) (holding that the fourth element of plaintiff's prima facie case may be satisfied by showing [he] was "otherwise discharged because of [his] race") (citing Bryan v. McKinsey & Co., Inc., 375 F.3d 358, 360 (5th Cir. 2004)). Simmons presents nothing to indicate he is relying upon any theory of liability other than that he was treated differently than similarly situated individuals.

- 9

affidavit and deposition, there is no comparative evidence that would lead to an inference that

Methodist discriminated against Simmons or treated similarly situated plaintiffs more favorably.

Accordingly, the Court finds that Simmons has not established a prima facie case of racial

discrimination because he has not demonstrated that other employees outside his protected class

were treated differently than he was.

iii. Defendant's Legitimate, Non-Discriminatory Reasons

Assuming, arguendo, that Simmons were able to establish a prima facie case of discrimination,

he would not prevail because Methodist has offered a litany of examples of Simmons' misconduct,

which Simmons has failed entirely to rebut. Methodist indicates, for example, that Simmons'

performance in a mandatory, required exam dropped from the 47 percentile in his second year to th

the 14 percentile in his third year. Def.'s Mot. 11. Pursuant to Methodist policy, all residents scoring th

below the 30 percentile are placed on a remediation plan. Id. In Simmons' year, four residents th

scored below the 30 percentile, and all were subject to the remediation plan, yet Simmons refused th

to sign the plan, and later claimed that he believed he may not be subject to it. Def.'s Mot. 12; App.

to Def.'s Mot. 34-35. Thus, there is no evidence that Methodist treated Simmons differently from

similarly situated residents, or strayed from its policy in placing Simmons on the remediation plan.

Second, Methodist has offered a non-discriminatory explanation for Simmons' inability to

work a Rheumatology rotation. Methodist contends that in March 2010, Simmons wrote to Dr.

Hunter and stated that he wanted to work his Rheumatology rotation in April, yet was scheduled

to work a rotation in Nephrology that month. Def.'s Mot. 13. Dr. Hunter responded that she had

requested information from the program coordinator and attached a copy of his schedule indicating

that he was not scheduled to do it in April. Id. Despite this, Dr. Hunter contacted Parkland Hospital

- 10

("Parkland") to see if it would permit Simmons to complete his Rheumatology rotation there. Id.;

App. to Def.'s Mot. 91. Because Parkland already had one resident scheduled to perform a

Rheumatology rotation in April, it could not accommodate another resident. Id. Nevertheless, Dr.

Hunter contacted that resident, who willingly gave up her rotation at Parkland so that Simmons

could work there. Id. However, Dr. Hunter then contacted Dr. Carol Croft, the Program Director

of Internal Medicine at Parkland, who refused to allow Simmons to perform the rotation because he

had failed tho attend his previously scheduled rotation at Parkland. Id. at 13-14; App. to Def.'s Mot.

91. Finally, Dr. Hunter informed Simmons in an email on March 26, 2010, that he could work a

Rheumatology rotation at Methodist during April, but Simmons declined. Def.'s Mot. 14; App. to

Def.'s Mot. 112. Though Methodist requires its residents to complete a Rheumtaology rotation in

order to graduate, it granted Simmons an exception and waived the requirement. Def.'s Mot. 15;

App to Def.'s Mot. 114.

Third, Methodist contends that it applied uniform vacation policies to Simmons' requests for

vacation days. Pursuant to the Program's Policy and Guidelines, residents do not receive credit for

a rotation unless they are present for at least three weeks. Def.'s Mot. 15; App. to Def.'s Mot. 60. On

March 23, 2010, Simmons requested a second week of vacation in May, which would have meant

that he may not have been present for at least three weeks of his May rotation. Simmons then asked 4

for an exception to this rule. Def.'s Mot. 15; App. to Def.'s Mot. 114. On April 6, 2010, Dr. Hunter

notified Simmons that the requirement would not be waived, but in an email notified him that she

was "willing to work to work with [him] on the vacation to try to get something figured out for this

Simmons was scheduled for night float from April 28, 2010, to May 4, 2010, which meant that4 he
would not have attended his rotation for those days. Def.'s Mot. 15.

- 11

month." Def.'s Mot. 15; App. to Def.'s Mot 114-15. The parties continued to correspond regarding

potential vacation dates, until Simmons sent Dr. Hunter an email on May 13 that stated that she

was "in a state of denial" regarding the situation. Def.'s Mot. 15; App. to Def.'s Mot. 86. The record

indicates, then, that Methodist applied its vacation policy as written and Simmons has failed to offer any evidence that it was applied in a discriminatory manner.

Finally, Methodist has offered several reasons to explain its decision to suspend and terminate Simmons. In December 2009, a supervising physician reviewed Simmons' performance and noted that he exhibited an unprofessional attitude in his elective Ambulatory rotation that he labeled "worrisome." Def.'s Mot. 18; App. to Def.'s Mot. 148. Simmons was also noted to have a "tendency to want to give patients what they want, even when such is no in patient's best medical interest." App. to Def.'s Mot. 148. In spring 2010, a number of physicians and other residents noted Simmons' continued poor performance and behavior. Def.'s Mot. 18-19. Simmons also frequently failed to respond to urgent pages or emails from his superiors. Def.'s Mot. 20. On May 14, 2010, Dr. Rivera and Dr. Hunter met with Simmons to discuss his performance and behavior, but Simmons became combative by yelling at Dr. Hunter and accused her of being unfair about his vacation schedule. Def.'s Mot 20; App. to Def.'s Mot. 130. At that point, Dr. Rivera terminated the meeting. Id. Later, on May 19, 2010, Simmons met with Dr. Rivera and refused to submit to a drug test, in violation of the Methodist Health System Human Resource Policy. Def.'s Mot 22; App. to Def.'s Mot. 175. Under the this policy, refusal to submit to a drug test results in automatic termination. Id. It was at that point that Dr. Rivera suspended Simmons, and that both GMEC and its Executive Committee voted not to permit Simmons to graduate from the Program. Def.'s Mot. 22-23.

In his Response, Simmons fails to deal substantively with these explanations. Rather, he relies

- 12

entirely on his own testimony that he was discriminated against because other residents were treated more favorably. Such assertions, unsupported by evidence, do not rebut evidence put forth by the employer that its reasons are legitimate and nondiscriminatory. See Grimes v. Tex. Dept. of Mental Health & Retardation, 102 F.3d 137, 139-40 (5th Cir. 1996) ("[U]nsubstantiated assertions are not competent summary judgment evidence."); Forsyth v. Barr, 19 F.3d 1527, 1533 (5th Cir. 1994) ("'Summary judgment, to be sure, may be appropriate, even in cases where elusive concepts such as motive or intent are at issue . . . if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.'") (quoting Krim v. BancTexas Grp., Inc., 989 F.2d 1435, 1449 (5th Cir. 1993)). Where an employee fails to offer any evidence apart from his

subjective belief that he was discriminated against, the employer fails to raise an issue of fact. Id.

Accordingly, Simmons has both failed to state a prima facie case of disparate treatment and

to rebut Methodist's legitimate, non-discriminatory reasons for both denying him vacation time and

for eventually terminating him. Therefore, Methodist's Motion as to Simmons' claim of disparate

treatment under Title VII is hereby GRANTED.

B. Disparate Impact

To establish a prima facie case of disparate impact, the plaintiff must show that a "facially

neutral employment" standard or policy operates "more harshly on one group than another."

Carpenter v. Steven F. Austin State Univ., 706 F.2d 608, 621 (5th Cir. 1983). To carry this burden,

the employee must establish that a specific practice or set of practices results in a significant disparity

between groups. Johnson v. Uncle Ben's, Inc., 965 F.2d 1363, 1367 (5th Cir. 1992). Therefore, to state

a prima facie case of disparate impact, a plaintiff must isolate and identify employment practices that

are allegedly responsible for statistical disparities. Wards Cove Packing, Inc. v. Atonio, 490 U.S. 642,

- 13

656 (1989), superseded by statute on other grounds, 42 U.S.C. § 2000e–2(k).

Simmons has failed to identify any practice or procedure that has a disparate impact on a

protected class. The Court cannot recognize any substantive claim for disparate impact in either his

pleadings or his Response. Accordingly, Methodist's Motion with regard to Simmons' claim of

disparate impact is hereby GRANTED.

C. Section 1981

"Claims brought pursuant to Title VII and § 1981 are 'governed by the same evidentiary

framework,' such that the analyses under both statutes are substantively the same." Jackson v.

Watkins, 619 F.3d 463, 466 (5th Cir.2010) (quoting Pegram, 361 F.3d at 281 n.7). Because the Court

determined that Simmons' claim fails under Title VII, his § 1981 claims are likewise dismissed.

Accordingly, Methodist's Motion as to Simmons' claim brought under § 1981 is hereby GRANTED.

IV.

CONCLUSION

The Court finds that Plaintiff has failed to plead a prima facie case of discrimination under

Title VII of the Civil Rights Act or § 1981. Furthermore, Plaintiff has failed to respond to

Defendant's legitimate and nondiscriminatory reasons that support the adverse actions taken against

him. Consequently, Plaintiff cannot show that there is a genuine issue of material fact, and therefore

cannot survive summary judgment. For the foregoing reasons, Defendant's Motion for Summary

Judgment is hereby GRANTED.

SO ORDERED.

SIGNED April 26, 2012

- 14

_____ JANE J. BOYLE UNITED STATES DISTRICT JUDGE

EXHIBIT-E 2

TRANSMISSION VERIFICATION REPORT

Retaliation
sent 5/6/10

TIME : 05/06/2010 15:45
NAME : NEUROLOGY
FAX : 2149475180
TEL : 2149475192
SER.# : 000K7N230991

| | |
|---|---|
| DATE,TIME | 05/06 15:45 |
| FAX NO./NAME | 3127555048 |
| DURATION | 00:00:00 |
| PAGE(S) | 00 |
| RESULT | BUSY |
| MODE | STANDARD |

BUSY: BUSY/NO RESPONSE

214-946-[illegible] • 888-946-DMG • Fax 214-946-7445 • www.[illegible].com
221 W. Colorado Blvd. • Pavilion II • Suite 730 • Dallas, Texas 75208

If you have any questions, please call. THANK YOU!!

RE: Signed E-mail

Number of Pages Including Fax Coversheet

Fax #: (214) 946-7445 Phone #: (214) 946-9898

From: Jason Simmons, MD

*EXHIBIT E*

*ACGME → retaliation*

On Thu, Apr 29, 2010 at 12:32 PM, Resident Services <residentservices@acgme.org>
wrote:

Dear Jason,

We have your complaint, but in order to pursue it we need your signature.  Please sign the email
and return it to me by email or fax (312-755-5048).  If you do not want to sign it, I can treat it as a
concern; that means calling the DIO and talking with him/her about it.  It would not affect the
program's accreditation where as a formal complaint might.

Marsha

Jason L. Simmons, M.D.

5/6/10

*Sent to ACGME*

*5/6/10*

*EXHIBIT E*

To whom it may concern,

I am a third year resident in the internal medicine program at Dallas Methodist Hospital. I am writing because the current DIO at this hospital needs to be removed in addition to the program director. I say this for several reasons, mainly for failure to respond to several resident complaints of harassment. I myself have been a victim of harassment by the program director for over a year. In the past I have proven my case and had the DIO has agreed with me. Following our agreements he continually fails to force the program director to change her system of harassment. The DIO has been aware of:


-Favoritism in the treatment of residents

-Program Director forcing disfavored residents to complete certain requirements that other residents do not

-"Burn Out" schedules given to residents who complain or do not conform

-Resident being threatened with termination by the program director if director was not allowed to review the resident's personal cell phone messages

-Residents placed on probation for performance on ITE

-Residents placed on probation for attendance. Attendance tracking at program has been proven to be flawed for over one year. DIO has been told on more than one occasion attendance tracking would be changed and still has not

-etc

The DIO has been guilty of:

-Stating matters will be addressed and not following through.

-Not responding to emails with direct questions

-Please see the attached letter that Dr. Rivera did not respond to for over 3 months. I sat for 30 minutes in his office waiting to discuss the letter. He did not show for the scheduled meeting. Only after I gave a copy to the COO of the hospital with a new complaint did he respond.

At present, Dr. Rivera is refusing to announce the results of his "investigation." I have been successful in convincing him of the grand scale of harassment that occurs at this residency program. He has since sat down with individual residents to discuss their personal experience. He assured me that he would compile the accounts, publicly announce a consensus and make recommendations for change. He completed this investigation roughly 3 weeks ago. In that time he has failed to meet with me despite

stating he would and ignored emails. He is hesitant to "publish" what he has found because of how damaging it is. The level of injustice that has gone on in the program for years is outrageous. I do not understand the reasons why he is protecting the program director. He is well aware that the majority of residents here are unhappy and for legitimate reasons. I even had to force him to change the format of how he carried out his investigation. Originally, he had Dr. Hunter's secretary sit in on the individual meetings as a "scribe." I had to explicitly state how atrocious the idea of having the very program director's secretary record the private interviews about the stated program director before he would change the format. To this day the residents who were interviewed under the original format have not given their full account.

It is hard to organize all the events that have occurred even in the last year. I am asking that the ACGME immediately send an individual or team to investigate this program. I ask that the ACGME force Dr. Rivera to publish the results of his investigation. The "in-house" investigations that occur here are half-hearted at best and produce predictable results. The program needs to be drastically changed. An investigation is occurring this Friday April 16, 2010. It would be a perfect forum for Dr. Rivera to address the residency.

I am not writing as the typical resident who is disgruntled with his residency experience. I have attached my personal CV to show that I have been successful during residency. I am truly concerned about the quality of this program. I am willing to risk what I have accomplished to motivate someone with a true action plan to end the real harassment occurring here.

Sincerely,

Jason L. Simmons, MD

**Cristal Cienfuegos**

**From:** jason simmons [kuriousmonkey@yahoo.com]
**Sent:** Monday, October 25, 2010 2:52 PM
**To:** Cristal Cienfuegos
**Subject:** 3rd set

 *EXHIBIT F*

▓▓▓▓▓,

--- On **Mon, 5/10/10, Rivera-Alsina, Manuel <*ManuelRivera-Alsina@mhd.com*>** wrote:

From: Rivera-Alsina, Manuel <ManuelRivera-Alsina@mhd.com>
Subject: RE: Vacation, Favoritism, etc....
To: "jason simmons" <kuriousmonkey@yahoo.com>
Cc: "Hunter MD, Leigh" <LeighHunter@mhd.com>, "Tedder, Stephen" <StephenTedder@mh⌷
"Turner, Berta" <BertaTurner@mhd.com>
Date: Monday, May 10, 2010, 12:13 PM

Regarding your vacations, this is an issue between you and the Program. If there is any problems that c⌷
resolved between the parties, or you feel there is any further issue that the DIO/AVPME needs to get inv⌷
I will get involved. Dr. Hunter needs to sit with you and solve the issue, if that does not happen and you ⌷
bring the issue to the Executive Committee of GME then please request so. ACGME contacted me rega⌷
issues, not your vacation conflict. The resolution of your vacation issues are within the program first, the⌷
use the established process GME has.

Manuel E. Rivera-Alsina, MD, MBA, FACOG, FACPE

AVPME/DIO

From: jason simmons [mailto:kuriousmonkey@yahoo.com]
Sent: Monday, May 10, 2010 10:57 AM
To: Rivera-Alsina, Manuel
Subject: RE: Vacation, Favoritism, etc....

Dr. Rivera,

I have contacted ACGME regarding your handling of the situation here. Hopefully they will be
soon. I am still waiting to resolve my vacation issue. Whenever you are ready please let me kno
inform Dr. Hunter/Modak that this process is being held up by yourself.

-Jason

2/24/2011

*EXHIBIT 6*

## ACGME Institutional Requirements

I.       Structure for Educational Oversight

I.A.         Sponsoring Institution

I.A.1.                   Residency and fellowship programs accredited by the Accreditation Council for Graduate Medical Education (ACGME) must function under the ultimate authority and oversight of one Sponsoring Institution. Oversight of resident/ fellow assignments and of the quality of the learning and working environment by the Sponsoring Institution extends to all participating sites. (Core)*

I.A.2.                   The Sponsoring Institution must be in substantial compliance with the ACGME Institutional Requirements and must ensure that its ACGME-accredited programs are in substantial compliance with the ACGME Institutional, Common, and specialty/subspecialty-specific Program Requirements, as well as ACGME Policies and Procedures. (Outcome)

I.A.3.                   The Sponsoring Institution must maintain its ACGME institutional accreditation. Failure to do so will result in loss of accreditation for its ACGME-accredited programs. (Outcome)

I.A.4.                   The Sponsoring Institution and its ACGME-accredited programs must only assign residents/fellows to learning and working environments that facilitate patient safety and health care quality. (Outcome)

I.A.5.                   The Sponsoring Institution must identify a:

I.A.5.a)                       Designated Institutional Official (DIO): The individual who, in collaboration with a Graduate Medical Education Committee (GMEC), must have authority and responsibility for the oversight and administration of the Sponsoring Institution's ACGME-accredited programs, as well as responsibility for ensuring compliance with the ACGME Institutional, Common, and specialty/subspecialty-specific Program Requirements; and, (Core)

I.A.5.b)                       Governing Body: The entity which maintains authority over the Sponsoring Institution and its ACGME-accredited programs. (Core)

I.A.6.                   A written statement must document the Sponsoring Institution's commitment to GME by providing the necessary financial support for administrative, educational, and clinical resources, including personnel, and which must be reviewed, dated, and signed at least once every five years by the DIO, a representative of the Sponsoring Institution's senior administration, and a representative of the Governing Body. (Core)

I.A.7.                   Any Sponsoring Institution or its major participating site that is a hospital must maintain accreditation to provide patient care. (Core)

I.A.7.a)                       Accreditation for patient care must be provided by:



I.A.7.a).(1)                    the Joint Commission; or, [Core]

I.A.7.a).(2)                    an entity granted "deeming authority" for participation in
                               Medicare under federal regulations; or, [Core]

I.A.7.a).(3)                    an entity certified as complying with the conditions of
                               participation in Medicare under federal regulations. [Core]

I.A.8.                         When a Sponsoring Institution or major participating site that is a hospital
                               loses its accreditation, the Sponsoring Institution must notify and provide
                               a plan of response to the Institutional Review Committee (IRC) within 30
                               days of such loss. Based on the particular circumstances, the IRC may
                               request the ACGME invoke its "Procedure for Alleged Egregious or
                               Catastrophic Events" policy. [Core]

I.B.            GMEC

I.B.1.                         Membership: The Sponsoring Institution must have a GMEC that includes
                               at least the following voting members: [Core]

I.B.1.a)                       the DIO; [Core]

I.B.1.b)                       a representative sample of program directors from its ACGME-
                               accredited programs; [Core]

I.B.1.c)                       a minimum of two peer-selected residents/fellows; and, [Core]

I.B.1.d)                       a quality improvement/safety officer or his or her designee. [Core]

I.B.2.                         Additional GMEC members and subcommittees: In order to carry out
                               portions of the GMEC's responsibilities, additional GMEC membership
                               may include others as determined by the GMEC. [Detail]

I.B.2.a)                       Subcommittees that address required GMEC responsibilities must
                               include a peer-selected resident/fellow. [Detail]

I.B.2.b)                       Subcommittee actions that address required GMEC
                               responsibilities must be reviewed and approved by the GMEC.
                               [Detail]

I.B.3.                         Meetings and Attendance: The GMEC must meet a minimum of once
                               every quarter during each academic year. [Core]

I.B.3.a)                       Each meeting of the GMEC must include attendance by at least
                               one resident/fellow member. [Core]

I.B.3.b)                       The GMEC must maintain meeting minutes that document
                               execution of all required GMEC functions and responsibilities. [Core]

I.B.4.                         Responsibilities: GMEC responsibilities must include:

| | |
|---|---|
| I.B.4.a) | Oversight of: |
| I.B.4.a).(1) | the ACGME accreditation status of the Sponsoring Institution and its ACGME-accredited programs; (Outcome) |
| I.B.4.a).(2) | the quality of the GME learning and working environment within the Sponsoring Institution, its ACGME-accredited programs, and its participating sites; (Outcome) |
| I.B.4.a).(3) | the quality of educational experiences in each ACGME-accredited program that lead to measurable achievement of educational outcomes as identified in the ACGME Common and specialty/subspecialty-specific Program Requirements; (Outcome) |
| I.B.4.a).(4) | the ACGME-accredited programs' annual evaluation and improvement activities; and, (Core) |
| I.B.4.a).(5) | all processes related to reductions and closures of individual ACGME-accredited programs, major participating sites, and the Sponsoring Institution. (Core) |
| I.B.4.b) | review and approval of: |
| I.B.4.b).(1) | institutional GME policies and procedures; (Core) |
| I.B.4.b).(2) | annual recommendations to the Sponsoring Institution's administration regarding resident/fellow stipends and benefits; (Core) |
| I.B.4.b).(3) | applications for ACGME accreditation of new programs; (Core) |
| I.B.4.b).(4) | requests for permanent changes in resident/fellow complement; (Core) |
| I.B.4.b).(5) | major changes in ACGME-accredited programs' structure or duration of education; (Core) |
| I.B.4.b).(6) | additions and deletions of ACGME-accredited programs' participating sites; (Core) |
| I.B.4.b).(7) | appointment of new program directors; (Core) |
| I.B.4.b).(8) | progress reports requested by a Review Committee; (Core) |
| I.B.4.b).(9) | responses to Clinical Learning Environment Review (CLER) reports; (Core) |
| I.B.4.b).(10) | requests for exceptions to duty hour requirements; (Core) |

| | |
|---|---|
| I.B.4.b).(11) | voluntary withdrawal of ACGME program accreditation; (Core) |
| I.B.4.b).(12) | requests for appeal of an adverse action by a Review Committee; and, (Core) |
| I.B.4.b).(13) | appeal presentations to an ACGME Appeals Panel. (Core) |
| I.B.5. | The GMEC must demonstrate effective oversight of the Sponsoring Institution's accreditation through an Annual Institutional Review (AIR). (Outcome) |
| I.B.5.a) | The GMEC must identify institutional performance indicators for the AIR which include: (Core) |
| I.B.5.a).(1) | results of the most recent institutional self-study visit; (Detail) |
| I.B.5.a).(2) | results of ACGME surveys of residents/fellows and core faculty; and, (Detail) |
| I.B.5.a).(3) | notification of ACGME-accredited programs' accreditation statuses and self-study visits. (Detail) |
| I.B.5.b) | The AIR must include monitoring procedures for action plans resulting from the review. (Core) |
| I.B.5.c) | The DIO must submit a written annual executive summary of the AIR to the Governing Body. (Core) |
| I.B.6. | The GMEC must demonstrate effective oversight of underperforming programs through a Special Review process. (Core) |
| I.B.6.a) | The Special Review process must include a protocol that: (Core) |
| I.B.6.a).(1) | establishes criteria for identifying underperformance; and, (Core) |
| I.B.6.a).(2) | results in a report that describes the quality improvement goals, the corrective actions, and the process for GMEC monitoring of outcomes. (Core) |

II.   Institutional Resources

| | |
|---|---|
| II.A. | Institutional GME Infrastructure and Operations: The Sponsoring Institution must ensure that: |
| II.A.1. | the DIO has sufficient financial support and protected time to effectively carry out his or her educational, administrative, and leadership responsibilities; (Core) |

II.A.2.          the DIO engages in professional development applicable to his or her responsibilities as an educational leader; and, [Core]

II.A.3.          sufficient salary support and resources are provided for effective administration of the GME Office. [Core]

II.B.          Program Administration: The Sponsoring Institution, in collaboration with each ACGME-accredited program, must ensure that:

II.B.1.          program directors have sufficient financial support and protected time to effectively carry out their educational, administrative, and leadership responsibilities as described in the Institutional, Common, and specialty/subspecialty-specific Program Requirements; [Core]

II.B.2.          programs receive adequate support for core faculty members to ensure both effective supervision and quality resident/fellow education; [Core]

II.B.3.          program directors and core faculty members engage in professional development applicable to their responsibilities as educational leaders; [Core]

II.B.4.          program coordinators have sufficient support and time to effectively carry out their responsibilities; and, [Core]

II.B.5.          resources, including space, technology, and supplies, are available to provide effective support for ACGME-accredited programs. [Core]

II.C.          Resident/Fellow Forum: The Sponsoring Institution must ensure availability of an organization, council, town hall, or other platform that allows residents/fellows from across the Sponsoring Institution's ACGME-accredited programs to communicate and exchange information with each other relevant to their ACGME-accredited programs and their learning and working environment. [Core]

II.C.1.          Any resident/fellow from one of the Sponsoring Institution's ACGME-accredited programs must have the opportunity to raise a concern to the forum. [Core]

II.C.2.          Residents/fellows must have the option, at least in part, to conduct their forum without the DIO, faculty members, or other administrators present. [Core]

II.D.          Resident Salary and Benefits: The Sponsoring Institution, in collaboration with each of its ACGME-accredited programs and its participating sites, must provide all residents/fellows with financial support and benefits to ensure that they are able to fulfill the responsibilities of their ACGME-accredited programs. [Core]

II.E.          Educational Tools

II.E.1.          Communication resources and technology: Faculty members and residents/fellows must have ready access to adequate communication resources and technological support. [Core]

II.E.2.            Access to medical literature: Faculty members and residents/fellows must have ready access to specialty/subspecialty-specific electronic medical literature databases and other current reference material in print or electronic format. (Core)

II.F.        Support Services and Systems

II.F.1.            The Sponsoring Institution must provide support services and develop health care delivery systems to minimize residents'/fellows' work that is extraneous to their ACGME-accredited programs' educational goals and objectives, and to ensure that residents'/fellows' educational experience is not compromised by excessive reliance on residents/fellows to fulfill non-physician service obligations. These support services and systems must include: (Core)

II.F.1.a)          Peripheral intravenous access placement, phlebotomy, laboratory, pathology and radiology services and patient transportation services provided in a manner appropriate to and consistent with educational objectives and to support high quality and safe patient care; and, (Core)

II.F.1.b)          Medical records available at all participating sites to support high quality and safe patient care, residents'/fellows' education, quality improvement and scholarly activities. (Core)

II.F.2.            The Sponsoring Institution must ensure a healthy and safe learning and working environment that provides for:

II.F.2.a)          Access to food while on duty at all participating sites; (Core)

II.F.2.b)          Safe, quiet, and private sleep/rest facilities available and accessible for residents/fellows to support education and safe patient care; and, (Core)

II.F.2.c)          Security and safety measures appropriate to the participating site. (Core)

III.     Resident/Fellow Learning and Working Environment

III.A.            The Sponsoring Institution and its ACGME-accredited programs must provide a learning and working environment in which residents/fellows have the opportunity to raise concerns and provide feedback without intimidation or retaliation and in a confidential manner as appropriate. (Core)

III.B.            The Sponsoring Institution is responsible for oversight and documentation of resident/fellow engagement in: (Core)

III.B.1.            Patient safety: The Sponsoring Institution must ensure that residents/fellows have:

III.B.1.a)  access to systems for reporting errors, adverse events, unsafe conditions, and near misses in a protected manner that is free from reprisal; and, [Core]

III.B.1.b)  opportunities to contribute to root cause analysis or other similar risk-reduction processes. [Core]

III.B.2.  Quality improvement: The Sponsoring Institution must ensure that residents/fellows have:

III.B.2.a)  access to data to improve systems of care, reduce health care disparities, and improve patient outcomes; and, [Core]

III.B.2.b)  opportunities to participate in quality improvement initiatives. [Core]

III.B.3.  Transitions of care: The Sponsoring Institution must:

III.B.3.a)  facilitate professional development for core faculty members and residents/fellows regarding effective transitions of care; and, [Core]

III.B.3.b)  ensure that participating sites engage residents/fellows in standardized transitions of care consistent with the setting and type of patient care. [Core]

III.B.4.  Supervision: The Sponsoring Institution must oversee:

III.B.4.a)  supervision of residents/fellows consistent with institutional and program-specific policies; and, [Core]

III.B.4.b)  mechanisms by which residents/fellows can report inadequate supervision in a protected manner that is free from reprisal. [Core]

III.B.5.  Duty hours, fatigue management, and mitigation: The Sponsoring Institution must oversee:

III.B.5.a)  resident/fellow duty hours consistent with the Common and specialty/subspecialty-specific Program Requirements across all programs, addressing areas of non-compliance in a timely manner; [Core]

III.B.5.b)  systems of care and learning and working environments that facilitate fatigue management and mitigation for residents/fellows; and, [Core]

III.B.5.c)  an educational program for residents/fellows and core faculty members in fatigue management and mitigation. [Core]

III.B.6.  Professionalism: The Sponsoring Institution must provide systems for education in and monitoring of:

III.B.6.a)  residents'/fellows' and core faculty members' fulfillment of

educational and professional responsibilities, including scholarly pursuits; (Core)

III.B.6.b)           accurate completion of required documentation by residents/fellows; and, (Core)

III.B.6.c)           identification of resident/fellow mistreatment. (Core)

IV.       Institutional GME Policies and Procedures

IV.A.       Resident/Fellow Recruitment

IV.A.1.       Eligibility and Selection of Residents/Fellows: The Sponsoring Institution must have written policies and procedures for resident/fellow recruitment and appointment, and must monitor each of its ACGME-accredited programs for compliance. (Core)

IV.A.2.       An applicant must meet one of the following qualifications to be eligible for appointment to an ACGME-accredited program: (Core)

IV.A.2.a)       graduation from a medical school in the United States or Canada, accredited by the Liaison Committee on Medical Education (LCME); or, (Core)

IV.A.2.b)       graduation from a college of osteopathic medicine in the United States, accredited by the American Osteopathic Association (AOA); or, (Core)

IV.A.2.c)       graduation from a medical school outside of the United States or Canada, and meeting one of the following additional qualifications: (Core)

IV.A.2.c).(1)       holds a currently-valid certificate from the Educational Commission for Foreign Medical Graduates prior to appointment; or, (Core)

IV.A.2.c).(2)       holds a full and unrestricted license to practice medicine in a United States licensing jurisdiction in his or her current ACGME specialty/subspecialty program; or, (Core)

IV.A.2.c).(3)       has graduated from a medical school outside the United States and has completed a Fifth Pathway** program provided by an LCME-accredited medical school. (Core)

IV.A.3.       An applicant invited to interview for a resident/fellow position must be informed, in writing or by electronic means, of the terms, conditions, and benefits of appointment to the ACGME-accredited program, either in effect at the time of the interview or that will be in effect at the time of his or her eventual appointment. (Core)

IV.A.3.a)       Information that is provided must include: financial support;



vacations; parental, sick, and other leaves of absence; and professional liability, hospitalization, health, disability and other insurance accessible to residents/fellows and their eligible dependents. (Core)

IV.B.        Agreement of Appointment/Contract

IV.B.1.            The Sponsoring Institution must ensure that residents/fellows are provided with a written agreement of appointment/contract outlining the terms and conditions of their appointment to a program. The Sponsoring Institution must monitor programs with regard to implementation of terms and conditions of appointment. (Core)

IV.B.2.            The contract/agreement of appointment must directly contain or provide a reference to the following items: (Core)

IV.B.2.a)            resident/fellow responsibilities; (Core)

IV.B.2.b)            duration of appointment; (Core)

IV.B.2.c)            financial support for residents/fellows; (Core)

IV.B.2.d)            conditions for reappointment and promotion to a subsequent PGY level; (Core)

IV.B.2.e)            grievance and due process; (Core)

IV.B.2.f)            professional liability insurance, including a summary of pertinent information regarding coverage; (Core)

IV.B.2.g)            hospital and health insurance benefits for residents/fellows and their eligible dependents; (Core)

IV.B.2.h)            disability insurance for residents/fellows; (Core)

IV.B.2.i)            vacation, parental, sick, and other leave(s) for residents/fellows, compliant with applicable laws; (Core)

IV.B.2.j)            timely notice of the effect of leave(s) on the ability of residents/fellows to satisfy requirements for program completion; (Core)

IV.B.2.k)            information related to eligibility for specialty board examinations; and, (Core)

IV.B.2.l)            institutional policies and procedures regarding resident/fellow duty hours and moonlighting. (Core)

IV.C.        Promotion, Appointment Renewal and Dismissal

IV.C.1.            The Sponsoring Institution must have a policy that requires each of its



ACGME-accredited programs to determine the criteria for promotion and/or renewal of a resident's/fellow's appointment. (Core)

IV.C.1.a)        The Sponsoring Institution must ensure that its programs provide a resident/fellow with a written notice of intent when that resident's/fellow's agreement will not be renewed, when that resident/fellow will not be promoted to the next level of training, or when that resident/fellow will be dismissed. (Core)

IV.C.1.b)        The Sponsoring Institution must have a policy that provides residents/fellows with due process relating to the following actions regardless of when the action is taken during the appointment period: suspension, non-renewal, non-promotion; or dismissal. (Core)

IV.D.        Grievances: The Sponsoring Institution must have a policy that outlines the procedures for submitting and processing resident/fellow grievances at the program and institutional level and that minimizes conflicts of interest. (Core)

IV.E.        Professional Liability Insurance

IV.E.1.        The Sponsoring Institution must provide residents/fellows with professional liability coverage, including legal defense and protection against awards from claims reported or filed during participation in ACGME-accredited programs, or after completion of the program(s) if the alleged acts or omissions of a resident/fellow are within the scope of the program(s). (Core)

IV.E.2.        The Sponsoring Institution must provide official documentation of the details of liability coverage upon request of the individual. (Core)

IV.F.        Health and Disability Insurance

IV.F.1.        The Sponsoring Institution must provide health insurance benefits for residents/fellows and their eligible dependents beginning on the first day of insurance eligibility. (Core)

IV.F.1.a)        If the first day of health insurance eligibility is not the first day that residents/fellows are required to report, then the residents/fellows must be given advanced access to information regarding interim coverage so that they can purchase coverage if desired. (Core)

IV.F.2.        The Sponsoring Institution must provide disability insurance benefits for residents/fellows beginning on the first day of disability insurance eligibility. (Core)

IV.F.2.a)        If the first day of disability insurance eligibility is not the first day that residents/fellows are required to report, then the residents/fellows must be given advanced access to information regarding interim coverage so that they can purchase coverage if desired. (Core)

IV.G.        Vacation and Leaves of Absence

IV.G.1.           The Sponsoring Institution must have a policy for vacation and other leaves of absence, consistent with applicable laws. (Core)

IV.G.2.           This policy must ensure that each ACGME-accredited program provides its residents/fellows with accurate information regarding the impact of an extended leave of absence upon the criteria for satisfactory completion of the program and upon a resident's/fellow's eligibility to participate in examinations by the relevant certifying board(s). (Core)

IV.H.        Resident Services

IV.H.1.           Behavioral health: The Sponsoring Institution must provide residents/fellows with access to confidential counseling and behavioral health services. (Core)

IV.H.2.           Physician impairment: The Sponsoring Institution must have a policy, not necessarily GME-specific, that addresses physician impairment. (Core)

IV.H.3.           Harassment: The Sponsoring Institution must have a policy, not necessarily GME-specific, covering sexual and other forms of harassment, that allows residents/fellows access to processes to raise and resolve complaints in a safe and non-punitive environment consistent with applicable laws and regulations. (Core)

IV.H.4.           Accommodation for disabilities: The Sponsoring Institution must have a policy, not necessarily GME-specific, regarding accommodations for disabilities consistent with all applicable laws and regulations. (Core)

IV.I.        Supervision

IV.I.1.           The Sponsoring Institution must maintain an institutional policy regarding supervision of residents/fellows. (Core)

IV.I.2.           The Sponsoring Institution must ensure that each of its ACGME-accredited programs establishes a written program-specific supervision policy consistent with the institutional policy and the respective ACGME Common and specialty/subspecialty-specific Program Requirements. (Core)

IV.J.        Duty Hours: The Sponsoring Institution must maintain a duty hour policy that ensures effective oversight of institutional and program-level compliance with ACGME duty hour standards. (Core)

IV.J.1.           Moonlighting: The Sponsoring Institution must maintain a policy on moonlighting that includes the following:

IV.J.1.a)              residents/fellows must not be required to engage in moonlighting; (Core)



IV.J.1.b)    residents/fellows must have written permission from their program director to moonlight; (Core)

IV.J.1.c)    an ACGME-accredited program will monitor the effect of moonlighting activities on a resident's/fellow's performance in the program, including that adverse effects may lead to withdrawal of permission to moonlight; and, (Core)

IV.J.1.d)    the Sponsoring Institution or individual ACGME-accredited programs may prohibit moonlighting by residents/fellows. (Core)

IV.K.    Vendors: The Sponsoring Institution must maintain a policy that addresses interactions between vendor representatives/corporations and residents/fellows and ACGME-accredited programs. (Core)

IV.L.    Non-competition: The Sponsoring Institution must maintain a policy which states that neither the Sponsoring Institution nor any of its ACGME-accredited programs will require a resident/fellow to sign a non-competition guarantee or restrictive covenant. (Core)

IV.M.    Disasters: The Sponsoring Institution must maintain a policy consistent with ACGME Policies and Procedures that addresses administrative support for ACGME-accredited programs and residents/fellows in the event of a disaster or interruption in patient care. (Core)

IV.M.1.    This policy should include information about assistance for continuation of salary, benefits, and resident/fellow assignments. (Core)

IV.N.    Closures and Reductions: The Sponsoring Institution must maintain a policy that addresses GMEC oversight of reductions in size or closure of ACGME-accredited programs, or closure of the Sponsoring Institution that includes the following: (Core)

IV.N.1.    the Sponsoring Institution must inform the GMEC, DIO, and affected residents/fellows as soon as possible when it intends to reduce the size of or close one or more ACGME-accredited programs, or when the Sponsoring Institution intends to close; and, (Core)

IV.N.2.    the Sponsoring Institution must allow residents/fellows already in an affected ACGME-accredited program(s) to complete their education at the Sponsoring Institution, or assist them in enrolling in (an)other ACGME-accredited program(s) in which they can continue their education. (Core)

\*\*\*

**\*Core Requirements:** Statements that define structure, resource, or process elements essential to every graduate medical educational program.
**Detail Requirements:** Statements that describe a specific structure, resource, or process, for achieving compliance with a Core Requirement. Programs in substantial compliance with the Outcome Requirements may utilize alternative or innovative approaches to meet Core Requirements.

**Outcome Requirements:** Statements that specify expected measurable or observable attributes (knowledge, abilities, skills, or attitudes) of residents or fellows at key stages of their graduate medical education.

**Footnote for IV.A.2.c).(3):** A Fifth Pathway program is an academic year of supervised clinical education provided by an LCME-accredited medical school to students who meet the following conditions: (1) have completed, in an accredited college or university in the United States, undergraduate premedical education of the quality acceptable for matriculation in an accredited United States medical school; (2) have studied at a medical school outside the United States and Canada but listed in the World Health Organization Directory of Medical Schools; (3) have completed all of the formal requirements of the foreign medical school except internship and/or social service; (4) have attained a score satisfactory to the sponsoring medical school on a screening examination; and (5) have passed either the Foreign Medical Graduate Examination in the Medical Sciences, Parts I and II of the examination of the National Board of Medical Examiners, or Steps 1 and 2 of the United States Medical Licensing Examination (USMLE).

## TABLE OF CONTENTS

I. PARTIES AND SERVICE…………………………………………………………page 1

II. .JURISDICTION……………………………………………………………...page 1

III. VENUE………………………………………………………………………page 1

IV. NATURE OF ACTION/APPLICABLE LAW…………………………….....page 1


V. FACTS……………………………………………………………………….page 2

VI. BACKGOUND…………………………………………………..………..page 3

VII. BREACH OF FIDUCIARY DUTY…………………………………………page 4

Count I: US District Court- Evidence Omission……………………………….page 4

Duty……………………………………………………………………...……page 4

Breach…………………………………………………………………………page 4

Causation:………………………………………………………………………page 5

Damages: ………………………………………………………………………page 5

VIII. DAMAGES ………………………………………………………………page 5

IX. EXEMPLARY DAMAGES……………………………………………………page 5

X. PRAYER & REQUEST FOR TRIAL BY JURY……………………………page 6


XI. CERTIFICATE OF CONFERENCE……………………………………...page 6

XII. CERTIFICATE OF SERVICE……………………………………………page 7

## TABLE OF AUTHORITIES

### Federal Statutes

28 U.S. Code § 1332 (a)……………………………………………………......page 1

### State Statutes & Codes

Tex. Civ. Prac. & Rem. Code Ann. § 16.004(a) (5) (Vernon 2002)……………………....…page 2

State Cases

Cosgrove v. Grimes, 774 S.W.2d 662, 665 (Tex. 1989)……………………………………...page 4

Guerrero v. Burlington County Mem. Hospital, 70 N.J. 344 (1976)…………………….page 3

Jones v. Blume, 196 S.W.3d 440, 447 (Tex. App. - Dallas 2006)……………………..…page 4

Skinner v Square D Co, 445 Mich 153, 163; 516 NW2d 475 (1994)……………………page 4

## TABLE OF ATTACHMENTS

Exhibit A: Audio Recording of May 20, 2010, GMEC meeting…………………………pages 2, 4

Exhibit B: November 2009 Letter to DIO complaining of Harassment……………pages 2, 3, 4, 5

Exhibit C: Email to Counsel: Questions Re: Lawsuit……………………………………...page 2

Exhibit D: Disposition of 3:14-CV-2958-B………...……………………...……...………pages 2, 5

Exhibit E: May 2010 letter to ACGME complaining of harassment…………………………page 3

Exhibit F: Email from DIO confirming awareness of ACGME complaint…………………page 3

Exhibit G: ACGME guidelines…………………………………..…………………………page 5